**TEXAS & PACIFIC RAILWAY COMPANY, Appellant,**

v.

**G. C. MOORE, Appellee.**

No. 5340.

Court of Civil Appeals of Texas.

El Paso.

Oct. 28, 1959.

Rehearing Denied Nov. 25, 1959.

W. O. Shafer, Odessa, Hill D. Hudson, Pecos, Tom L. Farmer, Dallas, of counsel, for appellant.

Gallagher, Francis, Bean, Wilson & Berry, J. O. Bean, Dallas, Warren Burnett, Odessa, for appellee.

PER CURIAM.

Appellee, G. C. Moore, plaintiff in the trial court, filed suit against appellant, Texas & Pacific Railway Company, ·for injuries alleged to have been sustained by him on or about July 2, 1955, when appellee's automobile was struck by a switch engine of appellant on the passing track of a five-track crossing over Crane Avenue

in the City of Odessa. Three of the tracks, including the one on which the switch engine was traveling, were protected by automatic signal devices, as well as by a sign, "Stop on Red Light". The automatic signal devices were not put into operation by the switch engine until after the collision. The jury verdict was in favor of appellee, on which the trial court entered judgment awarding appellee damages· in the sum of $45,000. Motion for new trial was timely filed and overruled by the court; appeal was perfected, and this case is properly before us.

This appeal is predicated upon five propositions in which appellant charges:

1. When only testimony showing the occurrence of an injury was from plaintiff himself, defendant's requested issue inquiring of the jury whether injury occurred should have been submitted.

2. Court's refusal to submit to jury requested material issue raised by both pleadings and evidence constituted error.

3. Where there were several railroad tracks, special issues, submitted under Article 6701d, Section 86, should have referred to the "track upon which the train was traveling", instead of referring to the "nearest rail of the railroad", which was admittedly three tracks and 250 feet away from point of collision.

4. Refusal to submit properly written requested issues referring to "nearest rail of track upon which engine was travelling" under Article 6701d, Section 86, constituted reversible error.

5. Where all material evidence, including that offered by plaintiff, shows that man 65 years of age is working and has earned $7,400 since the accident, verdict of $45,000 is excessive.

Appellant defended the suit upon an answer of general denial; a special denial that the collision in question was caused by any of defendant's agents, or that plaintiff received serious injury by reason there-of, and other special pleas to the effect that defendant failed to keep a proper lookout; failed to heed the bell of the approaching train; failed to heed the whistle of the approaching train; failed to stop his motor vehicle within 50 feet, but not closer than 15 feet, to the nearest rail of said track at a time when the engine constituted an immediate hazard clearly visible to anyone using ordinary care; failed to keep control of his motor vehicle; failed to wait until he could proceed in safety across said crossing; and failed to turn his motor vehicle in a direction parallel with said tracks, instead of attempting to cross the same after he discovered the danger of collision; which acts, defendant alleges, constituted negligence on the part of the plaintiff and which, individually and collectively, were the proximate cause or causes of the collision in question.

The evidence left no doubt that a collision occurred between appellant's switch engine and the automobile being operated by appellee, although there was a variance between the testimony of the witnesses as to the distance appellee's automobile was knocked by the force of the impact.

▮ Next, we must determine whether the evidence left any doubt whether appellee had, in fact, suffered an injury as a proximate result of the collision. Under well-settled rules in this State, if appellee's testimony as to injury is corroborated and undisputed, the trial court could assume that it was an established fact as a matter of law. Springfield Fire & Marine Ins. Co. v. Wm. Cameron & Co., Tex.Civ.App., 96 S.W.2d 788; Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904; Loughry v. Hodges, Tex. Civ.App., 215 S.W.2d 669.

Appellee's testimony bearing on the issue of injury, as alleged by him, is summarized. He testified he was on his way to work when struck near the middle of the right front wheel of his automobile by appellant's switch engine and was knocked about twice the width of his car, or a distance of about

12 or 15 feet, to the extreme west side of Crane Avenue; that when the locomotive hit, it caused a sudden movement to his body and head and popped his neck; that he was jammed up into the windshield and thrown to the left and forward into the corner of the windshield and was wedged between the windshield and the door; that the steering wheel struck him in the lower ribs; his head struck the windshield or the corner, or something; one of his knees struck the clamp that held the steering wheel to the dash, and that he was practically knocked out; that his neck, back, right knee and left leg were hurt, and that he was in a state of shock when he got out of the car and he did not believe he could have stood up if he hadn't leaned against his car. He also testified that his car was damaged and could not be operated after the collision; that a Mr. Holt, who had been a passenger in his automobile at the time of the collision, drove off with an officer to get another car, and returned to pick him up; that he took his water can and some other stuff from his own car and put it into Holt's car and went on to work. He did not tell anyone he was hurt while he was still at the scene of the accident. Moore was a driller and was working for the Oscar Bourg Drilling Company at the time he was involved in this accident; he was delayed by the accident and arrived at his job an hour and a half or two hours late, and worked for three or four days following the accident. His work as a driller required him to be able to look up into the derrick, and his neck was so sore that he could not look up. He quit his job after damaging some rig equipment because he was unable to look up.

Appellee was not hospitalized at any time after the accident, but was treated, beginning the third day after the accident, by Doctor Greenlees, who treated him for four or five months; and after that, by Doctor Horton for another four or five months. He was X-rayed and examined, but not treated, by Doctor Schoolfield, of Dallas (deceased at time of trial); by Doctor

Grice of Fort Worth, and, at appellant's request, he was examined by a Doctor Paul Rader. Appellee was treated with pills, rubbing, physical therapy, heat treatments, and was fitted with a neck brace, which he wore for possibly six weeks. Traction was applied to his neck and he was required to lie on a heat pad and put his neck into traction for a period of thirty minutes each day for some time. Appellee stated that since the accident he has taken quite a few aspirins all the time, and has also been taking Bufferins; that he has never been completely free from pain at any time since the accident. He testified that he did no work at all for seventeen months following the accident, and had to find lighter work than that of a driller. He worked in a domino parlor for a while, and then found work as a pipe-fitter at an hourly wage greater than that earned by him before the accident.

Appellee's wife, Mrs. G. C. Moore, also an interested witness, testified that on the morning of July 2, 1955, before the accident, her husband was in good health, active and able-bodied and was able to do hard labor; that when he returned from work that night, after the accident, he was shaking all over; that he returned to work the next day and for possibly three or four days after the accident, and that each day he complained of his head hurting him. That he finally left the job and did not work for seventeen months, during which time he was under treatment most of the time. Mrs. Moore gave her husband heat treatments, helped him put on his neck brace and helped him with the traction apparatus which he put on every day for a period of five or six weeks. He wore the neck brace for six or eight weeks until it caused a wart on his neck to become irritated, and he had to stop wearing it. That since the accident her husband has been nervous, complains of headaches, has been unable to sleep well; his weight dropped from about 175 pounds to 150 pounds; he does not carry his neck in a normal manner and has difficulty getting in and out of chairs,

and up and down. Appellant did not cross-examine this witness.

Appellant contends that the only testimony showing the occurrence of an injury was from plaintiff himself.

Mr. Sam McGill, a witness for appellee, testified that he saw the accident occur; that the switch engine was not traveling fast, but that it hit Mr. Moore's car right behind the front wheel and carried it across Crane Avenue and, when they stopped, the right front wheel of Mr. Moore's car was immediately off the pavement on the left-hand side, which was the west side of Crane Avenue.

The witness McGill was questioned as to what he did after the collision, and testified as follows:

"Q. Did you stop? A. Yes, sir.

"Q. Did you go up to Mr. Moore's automobile? A. Yes, sir.

"Q. Did you see him?

"Q. Did he appear to be affected or hurt in any way? A. Well, he was very shaken; he was leaning against his car, and he was what I would call in a state of shock, and I asked him if he was hurt, and he said that he didn't know, and he was visibly shaken."

Mr. J. B. Jernigan, another witness for appellee, testified that he was a "roughneck" and worked on the same well on which appellee was working as a driller on the date of the accident; that Moore came to work after the accident on the day of the accident; that he had observed his condition at that time. The witness stated that Moore was not able to take care of his job; his neck and shoulders were all stiff and he couldn't turn his head or look up either; that Moore worked for about three days after the accident before quitting, after tearing up a Kelly hose as a result of being unable to look up. Jernigan also testified that he had worked with appellee for several days immediately prior to the date of the accident, and that appellee was able to run the rig and did heavy work "just like we did"; that he was a good driller and could do the work in a good and safe manner until the accident.

Other witnesses testifying for appellee as to his condition before and after the collision were less closely associated with appellee with respect to the time of the accident, and their testimony need not be detailed. The testimony of the witnesses was to the effect that appellee's condition was good before the accident and poor thereafter.

The only medical testimony was supplied by Dr. Thomas W. Grice, who stated, while testifying in behalf of appellee, that he first saw and examined Mr. Moore in October, 1957, and again in March, 1958. His diagnosis was that Mr. Moore had an injury to his cervical spine, which caused spasms in his neck and a fixation of his vertebrae, and that this was not ankylosis because he could, under pressure, move them a little, even under pain; that pain was evidenced in his arms and shoulders as a direct cause from the cervical injury. That there was a rupture of the intervertebral disc in his cervical—a whiplash injury; that he also found a rupture at the fifth lumbar intervertebral disc. He testified that, in his opinion, it was a reasonable medical probability that the injuries found by him were caused by the force of the collision on July 2, 1955.

■ The question of injury was put in issue by appellant's general denial, and the burden was on appellee to prove that he had been injured. Texas & Pacific Railway Co. v. Van Zandt, Tex., 317 S.W.2d 528, 530.

■ While the burden of proof never shifts, the burden of going forward with the evidence may shift and be cast upon the opposite party when the proponent's evidence is sufficient to entitle him to a ruling that the opponent shall lose if he fails to come forward with evidence. The rule

relating to the shifting of the burden of producing evidence is well stated in Mc-Cormick & Ray, Texas Law of Evidence, Second Edition, ¶ 47

In the Van Zandt case the Supreme Court, speaking through Justice Calvert, held that the trial court erred in refusing to submit an issue inquiring whether plaintiff sustained personal injuries on the occasion in question. In that case, the question of injury was not only put in issue by defendant's general denial—it was also put in issue by defendant's evidence, which conflicted strongly with plaintiff's assertion of injury. The case was tried almost solely on this issue. The defendant's theory in the trial of the case was that plaintiff had suffered no injury; the majority of all the evidence offered by defendant tended to show this and, clearly, was in conflict with plaintiff's assertion that he had sustained personal injuries in the collision in question.

The court, in the Van Zandt case, recognizes that, in a large percentage of personal injury cases, "perhaps in a majority", there is no question but that injuries were sustained. "In such cases", the court said, "the conventional issue on damages and accompanying instruction permits the jury in arriving at the amount of damages to be awarded to make an incidental determination of the nature and extent of the injuries suffered."

We have carefully considered appellant's first and second propositions and are of the opinion that same must be overruled. We find corroboration of appellee's own testimony of the occurrence of an injury in the undisputed testimony of other witnesses; thus, appellant's contention that the only testimony showing the occurrence of an injury was from the plaintiff himself, is overruled.

Appellant contends that appellee's evidence on the issue of injury was controverted by the fact that, immediately after the accident, he told one or more witnesses that he was not hurt, or that he did not think he was hurt; by the fact that, after the accident, he took his water can and some other stuff from his car and put it into another car and went on to work; that he worked for four days after the accident and was never hospitalized. We think such facts alone are insufficient to negative the fact of injury, in view of the evidence adduced by appellee on this question.

While appellee was not rendered unconscious by the collision, had no visible bleeding or broken bones, the witness McGill, who saw appellee immediately after the accident, testified that "he was very shaken"; that he was in "what I would call a state of shock." He was "visibly shaken." We construe the term "state of shock" as used by the witness as synonymous with injury. "Shock" is variously defined as a sudden agitation of the physical or mental sensibilities; an insult to the nervous system; a state of profound depression of the vital processes of the body, characterized by pallor, rapid but weak pulse, rapid and shallow respiration, mental dullness, and sometimes nausea or vomiting. A "state of shock" is a condition which follows a "trauma", which is, itself, defined as a wound. See Words and Phrases for other definitions of the words "shock" and "trauma."

The testimony of the witness Jernigan, while circumstantial in nature, was based on his observation of appellee's physical condition for several days immediately preceding the accident, on the date of the accident within a matter of an hour and a half or two hours after the accident, and for three or four days thereafter. His testimony is uncontroverted by any other evidence. Neither this witness nor the witness McGill was cross-examined by appellant's counsel concerning their testimony relating to appellee's physical condition.

The testimony of appellee's medical witness, Dr. Thomas W. Grice, is not rebutted by any other medical testimony, although admittedly, at appellant's request, appellee was examined by a Dr. Paul Rader. The testimony of such doctor was presumably

available to appellant to disprove the testimony of Dr. Grice if it were not true.

◼ Where facts have been placed in issue by the pleadings and find support only in the uncorroborated testimony of an interested witness, the general rule is that a jury issue is presented, and the court may not find such facts established as a matter of law, even though no evidence in rebuttal thereof is offered by the opposing party. McGuire v. City of Dallas, 141 Tex. 170, 170 S.W.2d 722, 728. The McGuire case held, however, that this rule was not without exception, saying:

"Where the testimony of interested witness is uncontradicted, is clear and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony, conclusive effect may be given thereto." (Citing cases.)

The court also said:

"The applicable rule is further strengthened where the testimony of the interested witness, as in this case, is corroborated by other witnesses and the opposite party had the means and opportunity of disproving the testimony, if it were not true, and failed to do so."

The holding in the McGuire case was also cited with approval by the Supreme Court in Missouri-Kansas-Texas Railroad Co. v. McFerrin, Tex., 291 S.W.2d 931, 940. For a party to be entitled to the submission of an issue, it is not sufficient that the issue be raised by the pleadings. It must also be raised by the evidence. This, we think, appellant in the case at hand failed to do.

◼ While we think the safer and better practice would be to submit the question of injury in a personal injury suit, when raised by the pleadings and requested by the opposing side, we find no error on the part of the trial court, under the facts of this case, in refusing to do so. Appellant's

Points One and Two are accordingly overruled.

Points Three and Four have been grouped by appellant and will be discussed together. The points are based on an alleged violation by appellee of the duties imposed by Article 6701d, Section 86, Vernon's Annotated Texas Civil Statutes, which reads as follows:

"Sec. 86. Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

"(a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a train;

"(b) A crossing gate is lowered, or when a human flagman gives or continues to give a signal of the approach or passage of a train;

"(c) A railroad engine approaching within approximately fifteen hundred (1500) feet of the highway crossing emits a signal audible from such distance and such engine by reason of its speed or nearness to such crossing is an immediate hazard;

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

It is appellant's contention that the trial court erred in submitting the issues under this section in the language of the statute because there were several tracks, and the track upon which the train was "traveling" was three tracks and 250 feet removed from the "nearest rail of such railroad."

By way of counter-point, appellee urges that he was not required to stop where crossing signal devices indicated a clear crossing.

The rule announced by our Supreme Court, in Missouri-Kansas-Texas Railroad Co. of Texas v. McFerrin, Tex., 291 S.W.2d 931, interpreted the statute and laid down the test for determining when the driver is under a statutory duty to stop in the prescribed area. In a more recent case, Texas & New Orleans Railroad Co. v. Day, 316 S.W.2d 402, 405, our Supreme Court, in an opinion by Justice Calvert, again approved the rule stated in the McFerrin case, saying:

"Whether the truck operator was under a statutory duty to stop within 50 feet but not less than 15 feet of the nearest rail of the main line track on which the train was approaching must be tested by the rules laid down in our interpretation of the statute in Missouri-Kansas-Texas Railroad Co. of Texas v. McFerrin, Tex., 291 S.W.2d 931. We there held that a motorist approaching a railroad crossing is under no statutory duty to stop in the prescribed area unless a train is approaching on the track, is 'plainly visible', and is 'in hazardous proximity.' And we said that a train is not 'plainly visible' within the meaning of the statute unless 'a reasonably prudent person, situated as was the motorist and exercising ordinary care for his own safety, should have seen it.' 291 S.W.2d 936. In other words, our opinion and holding in the McFerrin case make clear (and the holding is made more pointed by the concurring opinion) that there is no statutory duty on a motorist approaching a crossing to stop unless a train is approaching on the track and is seen or should be seen by one similarly situated who is keeping a proper lookout for his own safety."

The application of the rules laid down in the McFerrin and Day cases, if applicable at all under the facts of the case now before us, presents a number of problems. The Day case holds that where a collision occurs at a "series of tracks" the inquiry should be confined to "the nearest rail of the track on which the train was approaching." The statute does not require a motorist to stop before undertaking to cross a track upon which no train is approaching, but does require him to stop before undertaking to cross a track upon which a train is approaching. The Day case holds that a motorist cannot discharge the duty imposed by the statute by stopping at another and different track. Thus, an inquiry in the language of the statute, whether the motorist stopped his automobile within 50 but not less than 15 feet from "the nearest rail of such railroad" was held not to be a proper submission where the crossing involved a series of tracks and defendant objected to the submission of the issue in the language of the statute, requesting that the inquiry be confined to the nearest rail of the track upon which the train was approaching.

The crossing involved in the McFerrin case was apparently a "single track" crossing. The crossing in the Day case was a multiple track consisting of a single series of eight tracks covering a distance of approximately 185 feet. The collision occurred on Track No. 4, some 93 feet from the first track or nearest rail of the crossing. While the exact manner in which the tracks in the two cases were protected is not affirmatively shown by the opinions, we assume that the crossing in the McFerrin case was protected by conventional non-mechanical railroad warning signs, and that the entire series of eight tracks in the Day case were similarly protected by the usual and customary cross-block railroad warning signs at each approach to the crossing. There is no showing that any of the series of eight tracks were separately protected, nor that one or more of the tracks were protected in a different manner from the others in the series.

It is quite clear, from an examination of the two opinions, that the facts in the McFerrin case were far different from the facts in the Day case. It becomes equally clear from a careful study of the record in the case under consideration that the facts

here are quite different from those of either the McFerrin or the Day case.

In this case there are no photographs, diagrams or sketches of the crossing in evidence; the testimony varies as to the distances between the several tracks, as well as the overall distance between the outer rail of the first track on the south and the outer rail of the fifth or last track on the north. All the testimony relating to distances is based on the best estimate of the witnesses, and none of them purport to have made actual measurements.

A proper understanding of this case requires a reconstruction of the scene of the crossing. The crossing in question appears to have consisted of a series of five parallel tracks running in an east-west direction and intersecting Crane Avenue, a north-south street in the City of Odessa. Approaching the crossing from the south, Crane Avenue is intersected first by Murphy Street. This intersection is protected by a traffic light and, while it is not contended by either side that this traffic light protects the railroad crossing, it is undisputed that the light may stop north-bound traffic at a point within 50 feet but not less than 15 feet of the nearest rail of the first of appellant's five tracks. After crossing Murphy Street, Crane Avenue is next intersected by the first, of two, separate series of tracks. The first series, on the south side of appellant's right of way, consists of two tracks identified as the "house track" and "glass spur"; the second series of tracks is located some 125 feet north of the north rail of track No. 2 of the first series of tracks, and consists of three tracks identified as the "team track", "passing track", and "main line". Each of the two series of tracks are separately protected; the two tracks of the first series being protected in one manner, while the north three, or second series of tracks, is protected in another and completely different manner. The south two tracks appear to have been protected by non-mechanical warning signs only, while the north three tracks are shown by the undisputed evidence to have been protected by various automatic crossing devices, including crossing gates, crossing bell and crossing flasher lights, as well as a sign, "Stop on Red Light".

■ The collision occurred on the "passing track", which is the middle track of the north three tracks. There was admittedly no train approaching on either of the south two tracks and, consequently, no statutory duty was imposed on appellee, G. C. Moore, to stop before undertaking to cross either of these two tracks, although the evidence indicates that he did stop within the prescribed area in obedience to the traffic light at the intersection of Crane Avenue and Murphy Street. Appellee admittedly did not stop before undertaking to cross either of the north three tracks. We have no evidence in the record showing the exact distance separating the middle track of the north three tracks from the nearest rail of the adjoining tracks on either side; however, from the estimates made by the witnesses, it appears that this distance was approximately eight feet. From the testimony of appellant's witness, R. P. Morrison, the south two tracks are a separate series of tracks from the north three tracks. It also appears from the testimony of Mr. Morrison, station agent for appellant company, that the width of the crossing at the north three tracks is approximately 25 feet. However, if we assume that the distance between the three tracks is approximately 8 feet, and take judicial notice of the fact that a standard gauge track is approximately 4 feet 8½ inches in width, we think it would be more accurate to assume that the crossing in question was approximately 30 feet wide.

The holding by the Supreme Court in the Day case, supra, wherein it directs that where a collision occurs at a grade crossing of a series of tracks, "the inquiry should be confined to the nearest rail of the track on which the train was approaching", has been a matter of the gravest concern to the members of this court; and, while we consider ourselves bound by the holding, we

would respectfully suggest that, while the legislative intent may not have been made perfectly clear by the provisions of Section 86 of Article 6701d, we think such intent is clearly manifested by Section 88(a) of the same statute, wherein it is said:

"After stopping as required herein and upon proceeding when it is safe to do so the driver of any said vehicle shall cross only in such gear of the vehicle that there will be no necessity for changing gears while traversing such and *the driver shall not shift gears while crossing the track or tracks.*" (Emphasis supplied.)

Section 88 clearly envisions a grade crossing of a series of tracks, and expressly requires the driver to stop such vehicle at a point within 50 feet but not less than 15 feet of the "nearest rail of such railroad." Such driver is not only not required to stop at any other rail, but is admonished to cross such "track or tracks" only in such gear of the vehicle that there will be no necessity of changing gears; and, further, directs that "the driver shall not shift gears while crossing the track or tracks."

We assume that the legislature intended to impose a greater degree of care upon the drivers of motor buses carrying passengers for hire and upon the drivers of school buses carrying our school children than it intended to impose upon the drivers of other vehicles; but we find it more difficult to assume that the legislature intended to prescribe a standard of conduct, by Section 88 of the Statute, for one class of drivers, the violation of which, by the class of drivers therein named, would on the one hand constitute negligence; while compliance therewith, on the other hand, by ordinary drivers, would convict such drivers of negligence.

If, as we have assumed, the north three tracks of appellant's crossing is 30 feet wide, and the tracks 8 feet apart, a driver of any vehicle who stops his vehicle within 15 feet of the nearest rail of each of the three tracks in successive efforts to ascertain if each of such series of tracks might be safely crossed, would be within 2 feet 4 inches of the south rail of the first track and exposed to the danger of being struck by a passing train while attempting to ascertain if the second track could be safely crossed. If a like stop was made before crossing the third track, he would be exposed to the hazard of being struck by trains passing on either or both the first and second tracks. We are loath to agree that the intention of the legislature was such as to require the driver of a motor vehicle to stop on any railroad track, or within such dangerous proximity of a track or tracks and, thus, possibly expose himself to a greater hazard than that sought to be avoided—while seeking to ascertain, in compliance with the statute, whether the next track in a series of tracks might be safely traversed. Any court must assume that the intent of the legislature was to provide a maximum of regulative protection for all classes of motorists, as well as the railroad companies.

Such has been our dilemma. In undertaking to resolve this question without doing violence to the holding in the Day case, we have carefully examined appellant's requested special issues, the court's charge, and the objections made by appellant to such charge, as well as the record in this case.

Appellant contends that the nearest rail of the railroad was three tracks and 250 feet away from the point of the collision. We must reject this contention, because the evidence clearly indicates that these five tracks were not a single crossing, but constituted two separate and distinct crossings, the first consisting of a series of two tracks, and the second, on which the collision occurred, consisted of a series of three tracks. Each of the two series of tracks was separately and differently protected. The nearest rail of such railroad at the second crossing, if we construe the evidence in the light most favorable to appellee, was only 12 feet 8 inches from the track on which the collision occurred. The

crossing in question was the one upon which the collision occurred. It was the only crossing protected by automatic signals, and it was to the circumstances and conditions surrounding this crossing that the trial court directed its inquiries in its charge to the jury.

In answer to special issues, the jury found against the railroad on the following numbered issues: (1) hazardous crossing; negligence and proximate cause in; (2–3) no flagman; (4–5) operating speed excessive; (6–8) crossing light failed to warn; (9–11) crossing gate failed to close; (12–14) crossing bell failed to warn; (15–17) failed to sound engine horn; (18–20) failed to ring engine bell; (21–22) failed to keep proper lookout; (23–24) failed to apply brakes; (25–26) plaintiff's peril, discovered, realized, but not in time; (31) damages $45,000; and in other issues acquitted appellee of negligence.

In Special Issue No. 41, the court inquired whether the switch engine was plainly visible before G. C. Moore reached a point 15 feet from the nearest rail of such railroad. While it is appellant's contention that the "nearest rail of such railroad", as used by the court in this issue and its related issues, refers to the south rail of the first series of tracks, we do not agree with such contention. The preceding issues refer only to the crossing at which the jury found the crossing light and crossing bell failed to warn and the crossing gate failed to close. From the standpoint of the court's charge as a whole, we think Special Issue No. 41 and its related issues quite clearly designate the crossing to which these issues refer. If the issue referred, as we believe it did, to the nearest rail of the north series of three tracks, and the jury having found that the engine was not plainly visible before reaching a point 15 feet from the nearest rail of such crossing; and if we may assume from the evidence, in the absence of a more precise manner of determining the distance, that the distance from the first rail of such crossing to the nearest rail of the track on which the engine was

approaching was 12 feet 8 inches, it would follow that the jury finding on the issue, as framed by the court, is equivalent to a finding that the engine was not plainly visible before G. C. Moore reached a point 27 feet and 8 inches from the nearest rail on which the engine was approaching, such distance being still well within the area of not more than 50 feet nor less than 15 feet, prescribed by the statute. If the engine was not plainly visible within the meaning of the statute, no statutory duty was imposed upon appellee to stop. While it is undisputed that the switch engine was "approaching" and was in "hazardous proximity" to the crossing, no duty was imposed upon appellee to stop unless the engine was also "plainly visible". These conditions must co-exist before a duty is imposed by the statute.

The jury, under the court's charge, used the reasonably prudent man test in determining whether the engine was plainly visible. The evidence most favorable to appellee was to the effect that about five box-cars were standing on the east side of the crossing, on the "team track", which was the first, or southernmost, track of the north three tracks, and within a few feet of the crossing; appellant's switch engine was approaching from the east on the middle, or "passing track", and the standing box-cars blocked appellee's view to the east, the track on which the train was approaching being about 8 feet from the track on which the box-cars were standing.

We hold that the statute, under the facts of this case, imposed no duty on appellee to stop before undertaking to cross the second series of tracks, and such holding renders the language complained of in the remaining issues immaterial. Appellant's Points Three and Four are accordingly overruled.

We have also given serious consideration to appellee's counter-point to the effect that appellee was not required to stop where crossing signal devices indicated clear crossing. And we say, without

passing on this question, that it is our view that the signals employed here were capable, *when operating,* of giving but one command, and that would be a command to stop. The signals did not operate, and thus did not affirmatively direct traffic to proceed. For this reason we believe that the test in such cases should be what a reasonably prudent man would do under the same or similar circumstances before undertaking to cross a railroad grade crossing obviously so equipped, but where no command to stop has been given.

■ We have considered appellant's fifth point, in which it is complained that the jury verdict of $45,000 is excessive. Appellee, Moore, was 62 years old December 1, 1954. Since he would have been 63 years old on his birthday nearest the date of his injury, July 2, 1955, evidence of life expectancy of 12.69 years was based on a man of 63 years of age. He was in good health before the collision. After the collision he was found, in the opinion of a medical witness, to have a ruptured intervertebral disc in the cervical spine (a whiplash injury), as well as injuries to his lower back which the witness diagnosed as a rupture of the fifth lumbar intervertebral disc. That either of these injuries resulted in serious, total and permanent disability; that appellee would never be able to do the work of an oilfield driller, or other oilfield work, and that he was not able to do the pipe-fitting work he had been doing, because such work aggravated his condition. Appellee was unable to work at all for seventeen months after the accident, and then was able to perform lighter work as a pipe-fitter only with the help of fellow employees, who took the load off of him. His total wages for the approximately three years after his injury was $7,400. For the same period of time preceding his injury, his earning capacity was as much as $21,-000. The evidence of appellee's earning power, alone, without a consideration of other evidence of pain and suffering, would sustain a verdict in excess of that found by the jury in this case. There is no show-

ing here, nor does appellant charge, that the jury was motivated by bias, prejudice or passion in arriving at the damages found in this case. The general rule is that it is for the jury to determine the amount of damages, and the appellate courts will not interfere if there is support in the evidence and absence of a showing of bias, prejudice or passion on the part of the jury. Appellant's fifth point is accordingly overruled.

Finding no error, the judgment of the trial court is affirmed.