EXXON CORPORATION, Appellant,

v.

Wesley WEST et al., Appellees.

No. 16723.

Court of Civil Appeals of Texas, Houston (1st Dist.)

Oct. 7, 1976.

Rehearing Denied Nov. 4, 1976.

McGinnis, Lochridge & Kilgore, Robert C. McGinnis, James H. Cowden, Peter M. Lowry, Austin, Walter B. Morgan, Dillard W. Baker, Houston, of counsel, for appellant.

Stayton, Maloney, Hearne & Babb, John W. Stayton, Austin, for appellees.

EVANS, Justice.

Exxon Corporation, the successor in interest to Humble Oil & Refining Company, appeals from a judgment decreeing the rights of certain royalty owners, the Wests, to gas produced from an underground reservoir being used by Exxon for the purpose of storing extraneous gas.

The trial court's judgment will be reversed and rendered.

The use of the West Clear Lake (Frio) reservoir for gas storage purposes was authorized by order of the Texas Railroad Commission, entered over the Wests' protest on January 20, 1970. The Wests did not appeal that order but on March 26, 1970, filed this action seeking to permanently enjoin Humble from using the reservoir for gas storage purposes until all native gas had been produced and, in the alternative, seeking a declaratory judgment that Humble should be required to pay royalty on all gas produced from the reservoir regardless of whether it should be native gas or injected gas. On September 1, 1970, Humble commenced, and has thereafter continued, the injection of extraneous gas into the reservoir.

On a previous trial of this case, the trial court denied injunctive relief, but granted the declaratory judgment requested by the Wests. On appeal, the trial court's judgment was reversed and remanded by the Court of Civil Appeals with instructions to enter the permanent injunction. 496 S.W.2d 212. However, the Supreme Court reversed the intermediate court's judgment, holding that the injunctive relief was not warranted, and that the cause should be remanded for the purpose of determining the amount of royalty which Humble should be required to pay to the Wests. *Humble Oil & Refining Company v. West*, 508 S.W.2d 812, 819 (1974). In its opinion, the Supreme Court stated the rule which would be applicable to the further trial of the case:

"... [I]t is our view that the act of commingling native and extraneous gas did not impose upon Humble the obligation of paying royalties on all gas there-

after produced from the reservoir, if the evidence establishes with reasonable certainty the volume of gas reserves upon which the Wests would have been entitled to royalties, absent injection of extraneous gas. The burden of this showing devolves upon Humble after proof by the Wests of their royalty interest, together with proof of Humble's commingling of extraneous and native gas. The threshold question for determination is whether the requisite computation of reserves is capable of establishment with reasonable certainty; and, if so, the further question to be resolved is whether the burden defined above is discharged by Humble under the evidence . . .

At the second trial of this case, from which this appeal is taken, Exxon presented two witnesses, a geologist and a petroleum engineer, both of whom were within its employ, who gave their expert opinions that the maximum (total) amount of gas which could have been in place in the reservoir as of September 1, 1970, the date storage operations were commenced, would have been 95.3 BCF (billion cubic feet). Theirs was the only testimony presented at the trial. At the conclusion of their testimony, both sides rested, and the trial court entered its judgment in favor of the Wests, declaring that Exxon is required to account to the Wests for royalty on all gas which is produced from the field, regardless of whether the gas is native or stored. In support of its judgment the trial court found, among other things, that Exxon had not established with reasonable certainty the maximum volume of either the "recoverable" gas or of the "total" gas which could have remained in the reservoir when gas storage operations were first commenced. In its findings the trial court specifically declared that it did not believe the witnesses' opinions that their calculations were reasonably certain as to the "maximum" volume of "recoverable" gas and it found that such determination could not be made with reasonable certainty. For reasons not clear, it made no specific finding to this effect with respect to the witnesses' opinions concerning the maximum "total" amount of gas

remaining in the reservoir. The trial court concluded, as a matter of law, that upon its findings that Exxon had not established with reasonable certainty the volume of gas reserves upon which the Wests would have been entitled to royalties, absent injection of extraneous gas, the Wests were entitled to be paid royalties on all gas produced from the reservoir, whether native or extraneous.

This court is first presented with the problem of determining the nature of the burden imposed upon Exxon under the Supreme Court's ruling. The Wests contend that the Supreme Court's decision required Exxon to establish with reasonable certainty the particular volume of recoverable gas upon which the Wests would legally have been entitled to receive royalties in the absence of injection of extraneous gas into the reservoir. Exxon contends that even if it failed to establish with reasonable certainty the amount of recoverable gas in the reservoir, it met its burden by establishing with reasonable certainty the maximum total amount of gas which could have been in the reservoir at the time storage operations were commenced. It is Exxon's position that even though the Wests were only entitled to royalties on recoverable gas produced from the reservoir, by virtue of Exxon's stipulation in the case it was agreed that the Wests would receive payment on the basis of the maximum, or total amount of gas in place at the time storage operations were commenced. Thus, Exxon argues that its burden should be examined on the basis of its stipulated willingness to grant a "windfall" to the Wests, as opposed to the alternative of having to pay royalties to the Wests on gas produced from the field "forever."

In view of Exxon's stipulation, this court holds that its burden was met if by a preponderance of the evidence it established with reasonable certainty the maximum total amount of gas which could have been in place in the reservoir when storage operations were commenced. The question is whether the evidence compels a finding that Exxon met this burden.

The only testimony presented was that of Worthy R. Warnack, a geologist, and Robert E. Whitson, a petroleum engineer, both of whom were employed by Exxon and who were qualified as expert witnesses on the issues in question. Both witnesses had also testified at the first trial and in that connection they had prepared the Exxon Reserve Study, representing their expert opinion of the actual total amount of gas in place and the actual amount of recoverable gas in the reservoir at the time gas storage operations were commenced. At the second trial, these witnesses again presented the Exxon Reserve Study and in addition, they presented the Exxon Maximum Reserve Study, representing their expert opinion of the maximum amount of gas which could have been in place in the reservoir at the time gas storage operations were commenced. According to the witnesses' testimony, the maximum reserve study was made for the purpose of providing a "margin of error" safety factor by extending every parameter (from which, collectively, the approximate amount of reserves was determined) to the "bounds of reason."

The bases for the Exxon Reserve Studies were electric well logs, core samples, well test information, and similar data obtained from some 32 wells drilled over the 1500 acre area of the West Clear Lake Field. Although the Wests contend that Exxon had data covering only a small percentage of the reservoir, the geologist Warnack testified that he had more information available to him than a geologist usually has in making reserve estimates in a gas field. He testified that he had the logs for about 35 wells, some inside the field and some outside, and that the density of wells was greater than would generally be found in Gulf coast area test fields. By using this information, he was able to determine the maximum remaining acre feet of gas sand in the field.

It was principally Warnack's testimony which established the size, the productive extent, of the reservoir. It was necessary to make a determination of the amount of gas originally in place so that by subtract-

ing therefrom the amount of gas which had been produced, the volume of gas remaining in the reservoir could be computed. Warnack testified that the reservoir originally contained 155,502 acre feet of productive gas sands, a productive areal extent of approximately 1500 acres. He testified that as of January 1, 1969, there were about 21,744 acre feet of gas sand remaining in the reservoir.

In order to determine the size of the reservoir, it was necessary to fix the location of its ceiling, which was the point of contact of the gas bearing Frio sand formation with the impermeable shale formation, and to determine the point of contact between the sand formation and the salt water bearing sand which formed the floor of the gas reservoir. It was also necessary to determine the areal location of a fault which sealed the gas within the reservoir and constituted its eastern boundary. Using the well logs and other data available to him, Warnack stated his opinion that 21,744 acre feet of productive gas sand remained in the reservoir on January 1, 1969. The petroleum engineer, Whitson, using Warnack's geological interpretations, computed the remaining gas in place in the reservoir on September 1, 1970, to be 35 BCF.

At the first trial, in response to the trial court's question, Warnack testified that he could not state the "margin of error" in the Exxon Reserve Study. Accordingly, in preparing for the second trial, Warnack and Whitson prepared the Exxon Maximum Reserve Study to determine just how large the reservoir could be and just how much remaining gas the reservoir could contain "within the bounds of reason." In making his geological interpretation for the Maximum Reserve Study, Warnack picked the highest point on the log for the ceiling of the reservoir, the deepest point for the gas/water contact and the most eastern areal location for the fault; all of these points being extended, in the witnesses' opinion, to the "bounds of reason." Thus, the Maximum Reserve Study was intended to depict the outermost parameters of the gas reservoir as might be determined by

any reasonable geologist or engineer interpreting the data available. In furtherance of this purpose, Warnack testified that the well logs were re-evaluated in order to provide as high a net effective pay interval in each well as was reasonably possible and the top of the reservoir was also enlarged by flattening the contours of the crest. Whitson testified that in making the Maximum Reserve Study, their approach was to determine the maximum gas reserves which reasonably could be possible in the reservoir, by the process of extending to the bounds of reason each of the individual parameters that entered into their reserve calculations. Under the Maximum Reserve Study, the estimated amount of the productive gas sand remaining in the reservoir on January 1, 1969, was increased from 21.7 thousand acre feet to 51.7 thousand acre feet and the maximum total remaining gas in place on September 1, 1970, was increased from 35 BCF to 95.3 BCF. On the basis of the Maximum Reserve Study, Whitson testified that in his opinion it was reasonably certain that the gas in place in the reservoir at the time of injection of extraneous gas could not have exceeded 95.3 BCF.

The Wests did not offer any testimony to controvert the testimony of Exxon's expert witnesses. They did offer in evidence the statement of facts and exhibits from the first trial "for whatever benefit they may have as admissions and declarations against interest." They argue that the testimony of Exxon's own witnesses "completely demolished" its claim that its reserve study was reasonably accurate and that both studies were the product of witnesses' opinions which the trial court was at liberty to disregard.

In their attack on Warnack's testimony the Wests point to the fact that remapping, which resulted from four new wells being drilled between the date of the Railroad Commission hearing and the second trial, resulted in about a 2% increase in the number of net acre feet. The Wests argue that it is obvious that if additional wells should be drilled, the size of the reservoir might be further increased. Although Warnack admitted he didn't know whether drilling of more wells would result in more changes, he testified that in his opinion the net effect of any such changes would be very minor. He stated that the small change caused by the four new wells indicated very close control over the reserve calculations due to the well density in the field and high quality of data available.

The Wests complain of Warnack's testimony as to the areal location of the fault on the east side of the reservoir, contending that his movement of the fault some 300 feet to the east of its location as shown on the Reserve Study, demonstrates the inaccuracy of its location. Warnack testified that they had been able to locate the fault in about 22 wells over the field and that by entering the subsea elevation of that fault by the wells' symbol, they had contoured the fault plain. He admitted that the determination of where a well cuts a fault involves some judgment and opinion upon which geologists sometimes differ, but that there was good fault control so that in his opinion they were able to draw a very accurate presentation of the fault plain. After explaining in detail how he found and located the fault in the Reserve Study and how and why he changed it in the Maximum Reserve Study, he testified that, in his opinion, the location as shown in the Reserve Study was correct; that the Maximum Reserve Study merely indicated the farthermost point to which the fault location could be extended within the bounds of reason.

The Wests also level criticism at Warnack's testimony with respect to the location of the gas/water contact constituting the floor of the reservoir. The Wests point to Warnack's testimony at the first trial, indicating that he could not explain why some of the wells tested had salt water levels higher than the level which he picked as the gas/water contact for the reservoir. At the second trial, Warnack used a system of formation "levels" to explain how certain impermeable shale barriers might cause a particular well to have a gas/water contact which would not be consistent with other

wells. There is no inconsistency in Warnack's explanation and the testimony given by him at the prior trial.

In making his computation of remaining gas in place, the engineer Whitson applied porosity, permeability, and formation volume factors to the predetermined net acre feet of gas sand in the reservoir. The Wests complain of Whitson's estimates of the porosity and permeability factors, contending that his estimates were obtained by striking purely mathematical averages. Whitson's testimony, both at the first and second trials, established that these estimates were, in his opinion, reasonable and in line with the porosity and permeability factors found in other Frio sandstone fields.

The Wests argue that there are many possibilities for error in the Maximum Study. They complain that in obtaining the net effective sand count in each well, Warnack counted intervals containing half sand and half shale as though they contained pure gas sand. This method of computation is in accord with the stated purpose of the Maximum Reserve Study, and the increase in the net sand count in this manner was clearly beneficial to the Wests. The Wests also argue that Whitson did not give due effect to the structural position within the reservoir of the tracts under which the Wests own royalty interests, contending that due to the aquafier connected to the reservoir, there is a very strong and efficient water drive which can cause the production of a tremendous amount of gas from tracts high on the structure. The Wests contend that by ignoring structural position, Whitson overlooked the possibility that the tracts in which the Wests held royalty might ultimately produce much more gas than would be indicated by an areal share of the net acre foot values. The Wests' contention overlooks the fact that the water drive affects only that gas which is recoverable from the reservoir, and since Exxon has stipulated that the Wests are entitled to have royalties determined on the basis of the maximum total volume of gas remaining in place in the reservoir, the water drive phenomenon would not be a relevant factor. Similarly, the Wests' contention that the Maximum Study is inaccurate with respect to the recovery efficiency factor used to calculate recoverable gas in place is not relevant to the ultimate inquiry before the court.

■ The opinion testimony of expert witnesses, even though not contradicted by an opposing expert, is generally held not to be binding upon the trier of facts if more than one possible conclusion can be drawn from the facts. *Gregory v. Texas Emp. Ins. Ass'n*, 530 S.W.2d 105 (Tex.1975). This is particularly true where the experts' testimony is based upon studies made while in the employ of the party who is offering their testimony. *Luttes v. State*, 159 Tex. 500, 324 S.W.2d 167, 189 (1959).

However, where the nature of the subject matter of the experts' testimony is such that the trier of facts must be guided solely by the opinion of experts in that scientific field, the opinions given by the expert witnesses may be regarded as conclusive, if otherwise credible and free from contradiction and inconsistency. *Scott v. Liberty Mutual Ins. Co.*, 204 S.W.2d 16, 18 (Tex.Civ. App.—Austin 1947, writ ref'd n. r. e.); *Coxson v. Atlanta Life Ins. Co.*, 142 Tex. 544, 179 S.W.2d 943 (1944).

A review of the testimony of Exxon's witnesses shows that their opinion given on the first trial as to the size and extent of the reservoir remains substantially unchanged at the time of the second trial. Their testimony with respect to the Maximum Reserve Study did not reflect any change in their opinion as to the actual location of the parameters of the gas reservoir, but instead indicated their estimate as to the reservoir parameters, extended to the "bounds of reason". The expert testimony that the maximum total remaining gas in place on September 1, 1970, could not with reasonable certainty have exceeded 95.3 BCF, is uncontradicted either by direct testimony or by inferences to be drawn from the testimony presented. The only reasonable conclusion that can be drawn from the evidence presented is that afforded by the opinions of the Exxon witnesses.

■ Although Warnack and Whitson were employees of Exxon, and may be considered interested witnesses, their testimony was clear, direct and positive and there was nothing to cause any reasonable suspicion as to the credibility of their testimony. Furthermore, the record reflects that expert testimony available to the Wests could have been presented in contradiction of the testimony of Exxon's witnesses. The fact that the Wests had an opportunity to offer contrary evidence and failed to do so, constitutes effective corroboration of the testimony of these witnesses. *Bayou Drilling Co. of Texas v. Baillio,* 312 S.W.2d 705, 709 (Tex.Civ.App.—Houston, 1958, writ ref'd n. r. e.); *Cochran v. Wool Growers Central Storage Co.,* 140 Tex. 184, 166 S.W.2d 904 (1943); *Gibbs v. Wheeler,* 306 S.W.2d 929, 934 (Tex.Civ.App.—Austin, 1957, writ ref'd n. r. e.); McDonald, Texas Civil Practice, Vol. 3, Sec. 11.28.6, p. 250.

■ Exxon's burden under the Supreme Court's decision, and pursuant to its stipulation, was to establish by a preponderance of the evidence the maximum total volume of gas reserves in the reservoir at the time gas storage operations were commenced. It met this burden by presenting clear, positive and unimpeached testimony of experts who, upon sufficient factual bases, stated their estimate of this volume. The ultimate issue was not required to be proven with exact certainty, only with reasonable certainty. *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097 (1938).

■ Where, as in this case, there has been a conversion of goods through intentional commingling, and the evidence establishes a reasonably certain estimate of the extent of property converted, judgment should be entered upon the basis of such amount, even though the precise amount cannot be ascertained with reasonable certainty. *Ortiz Oil Co. v. Luttes,* 141 S.W.2d 1050, 1055 (Tex.Civ.App.—Texarkana 1940, writ dism'd by agr.).

The testimony of the witnesses, although interested, was corroborated and undisputed; in the absence of contrary evidence or inconsistency raising a reasonable suspicion as to its truth, it was conclusive of the issue. *Texas & P. Ry. Co. v. Moore,* 329 S.W.2d 293, 299 (Tex.Civ.App.—El Paso 1959, writ ref'd n. r. e.); *Kamp v. Hargis Building Co.,* 238 S.W.2d 277, 282 (Tex.Civ.App.—Galveston 1951, writ ref'd n. r. e.).

In *Teal v. Powell Lumber Co.,* 262 S.W.2d 223, 239 (Tex.Civ.App.—Beaumont 1953, no writ), a boundary suit, the expert was a surveyor who testified without contradiction as to ground objects he had found and measurements he had made; based thereon he gave his opinion as to the location of the original witness-trees called for as the survey's corners. Holding that the trial court in a non-jury trial was not at liberty to disregard this testimony, the court stated:

"Counsel for appellee also advance the theory that the evidence adduced by appellee, taken in conjunction with the physical aspects of the trees themselves, showed the witness Stonecipher to be so palpably in error about the ages of the sweet gum tree and the white oak tree, and in his opinion that they were original witness-trees called for at the northeast corners of the Allen league and the Suddeth survey, that the trial court was at liberty to disbelieve and disregard all of the witness' testimony. In essence, their contention appears to be that the trial court was warranted in finding, and should therefore be presumed to have found, that the witness did not bona fide entertain the opinions which he expressed, but swore falsely regarding them, and was therefore unworthy of belief in any of his testimony.

"We do not think the evidence warranted any such conclusion by the trial court, and since the testimony of the witness with reference to the objects he found on the ground, the measurements he made, etc., was uncontroverted, we are of the opinion that the rule announced in the case of *Texas & N. O. R. R. Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 530, with reference to the province of the jury has equal application to the trial court in this instance; that is: 'It is the province of the jury to decide the issues which are raised by conflicting evidence, but where

there is evidence upon an issue and there is no evidence to the contrary, then the jury has not the right to disregard the undisputed evidence and decide such issue in accordance with their wishes.'"

In the case at bar, the only conclusion which can reasonably be drawn from the evidence presented is that the maximum total gas remaining in the reservoir upon commencement of gas storage operations was 95.3 BCF. There is neither legal nor factual basis upon which the trial court's judgment can be sustained. Since it does not appear that the cause should be remanded for further proceedings in the interest of justice or for other reason, the judgment of this court will be one of rendition. *Hodges Tire Co. v. Kemp,* 334 S.W.2d 627 (Tex.Civ.App.—Fort Worth 1960, no writ).

The judgment of the trial court is reversed and judgment is rendered that the maximum total gas remaining in the gas reservoir in question as of September 1, 1970, does not exceed 95.3 BCF and that Exxon is not required to account to the Wests for their royalty based on gas produced from the field in excess of that amount.