Ron GABRIEL and Lana
Gabriel, Appellants,

v.

Clyde LOVEWELL, Appellee.

No. 06–04–00076–CV.

Court of Appeals of Texas,
Texarkana.

Submitted March 17, 2005.

Decided May 26, 2005.

Troy A. Hornsby, Miller, James, Miller & Hornsby, LLP, Texarkana, for appellants.

Kevin P. Riley, Bankston Riley, LLP, Houston, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Ron Gabriel and wife, Lana, horse farm owners, appeal from a judgment on a jury verdict in favor of Clyde Lovewell, horse owner, based on Lovewell's allegations of negligence and breach of implied warranty in connection with the death of a filly in the Gabriels' care. The jury awarded damages of $10,075.00 plus prejudgment interest of $4,372.27, court costs of $4,446.22, and attorney's fees of $40,000.00, totaling $58,893.49 plus postjudgment interest. Although Lovewell also alleged conversion and use of false, misleading, or deceptive trade practices, the jury limited his recovery to the allegations of negligence and breach of implied warranty. On appeal, the Gabriels contend that, because Lovewell failed to present expert testimony, there is legally and factually insufficient evidence to establish the causation element of each cause of action. We conclude the evidence is legally and factually sufficient and affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Summary and Background

In 1998, pursuant to contract, Lovewell bred his mare, Shappas Delight, with the Gabriels' stallion, Clu Heir. The mare gave birth in February 1999 to a filly, whose death is the subject of this appeal.

In March 1999, Lovewell took Shappas Delight to the Gabriel Quarter Horse Farm so she could be bred to Clu Heir again. The filly went with its mother. While there, the filly would be weaned from her mother, and offers would be fielded for the filly's sale. Although apparently healthy when she arrived at the Gabriels' farm, she became ill very shortly after she was weaned, displaying symptoms of pneumonia and experiencing an elevated temperature and diarrhea.

On Saturday, July 24, 1999, Ron called William Gilbert, a veterinarian and partner at the Winnsboro Veterinary Clinic, to come to the farm to look at the sick filly. Gilbert went to the farm and ordered medication and fluids be administered to the filly. The parties dispute what instructions Gilbert left with the Gabriels that day. On Monday, July 26, 1999, the filly's condition worsened and Lana called David Howton, also of the Winnsboro Veterinary Clinic and the primary veterinarian who had been caring for the Gabriels' horses for ten to twelve years. Howton advised Lana to bring the filly to the clinic, which Lana did at approximately 5:30 p.m. Lana testified this trip to the clinic from their horse farm takes approximately one hour and fifteen minutes. Although the filly was able to walk onto the trailer—with assistance—when she left the Gabriels' farm, she was unable to stand or walk by the time she arrived at the clinic and was in very poor condition. She died at approximately 8:30 p.m.[1] Renal failure caused

---

1. The filly's body was destroyed without Love-   well's knowledge and without having under-

by endotoxemia, stemming from colitis, was diagnosed as the cause of the filly's death.

## B. July 19–23 Treatment by the Gabriels

When the filly began suffering from respiratory problems and diarrhea, and before Gilbert's visit to the horse farm, the Gabriels administered the following medications to the horse: Rebound, Naxcell, Erythromycin, and Banamine.

### 1. Rebound

Rebound, according to Ron's testimony, is a generic form of Probios, apparently an over-the-counter treatment for diarrhea. Neither Gilbert nor Howton were familiar with Rebound. Ron conceded he did not contact a veterinarian regarding this treatment, likening it to a human taking Pepto–Bismol.

### 2. Naxcell

Naxcell is an antibiotic with which the Gabriels were treating the filly before Gilbert's visit on Saturday. Neither veterinarian ordered the use of Naxcell. Gilbert did order the Gabriels to continue giving the filly Naxcell, in addition to other medication and fluids. The evidence does not indicate that Naxcell could have caused or contributed to the horse's symptoms.

### 3. Erythromycin

Erythromycin is another antibiotic often used by the Gabriels when a horse develops a respiratory infection. Howton testified this drug is "very prone to cause diarrhea." Gilbert also confirmed this common side effect.

Ron testified he does not give antibiotics to a horse without a doctor's order to do so. Specifically, he testified he does not give Naxcell or Erythromycin without a veterinarian's orders. Ron explained that, on this occasion, he must have noted the filly's elevated temperature and called the clinic and was told to "[p]ut it on Erythro." Howton testified that clients do not usually need to call about treating respiratory problems with Erythromycin.

Although Ron testified that one of the veterinarians must have prescribed Erythromycin for the sick filly, both doctors deny having ordered it. Additionally, all parties deny there was a standing order for the Gabriels to use Erythromycin when a horse experienced respiratory problems. Howton testified, however, that Erythromycin is the "standard protocol" on the Gabriel farm to treat a foal with respiratory problems.

Gilbert testified Erythromycin would probably have been appropriate to give to this filly. He also testified that it was good that the filly was taken off Erythromycin and that the Gabriels were directed to discontinue its use. Howton agreed that use of Erythromycin was indicated under these circumstances, at least until the filly suffered from diarrhea.

### 4. Banamine

Banamine is an anti-inflammatory medication given to treat an elevated temperature. Both Gilbert and Howton testified that use of Banamine would have been appropriate here, where the horse was in decent shape overall, but its temperature spiked. Gilbert's records, however, indicate he did not prescribe Banamine for this filly. Howton testified it is "possible" he (Howton) ordered it. He admitted that Banamine can cause colitis, but further testified, "It's also the treatment of choice." He stated that an evaluation of

gone a necropsy. Based on that information, and a statement in support by the man who picked up the horse's body, Lovewell alleged

that the Gabriels had converted the filly. The jury rejected this theory of recovery.

the benefits and side effects of Banamine is a balancing act that a veterinarian must consider before administering it. Veterinarian consultation before use, however, is vital, especially when a horse is dehydrated. This special concern is due to the fact that Banamine is excreted through the kidneys and can, therefore, lead to renal problems. Uremia is one of those complications and is one which this filly suffered.

## C. Gilbert's July 24 Visit and His Instructions to the Gabriels

Gilbert testified the filly was in "pretty good shape" during his visit on Saturday. He directed the Gabriels to discontinue use of Erythromycin. He ordered them to continue giving Naxcell, and he added Gentamycin, another antibiotic, to the horse's treatment. He also ordered that the horse be given fluids. Finally, he maintains he instructed the Gabriels to contact the clinic if the horse's condition did not improve.

Both doctors testified it is preferable in many cases to treat a foal at its location as long as the facilities and help are adequate. They added it is stressful for a foal to be transported during the extreme East Texas summer heat. Gilbert testified he instructed the Gabriels to call the clinic if the horse did not improve as far as eating, drinking, responding to medication, and temperature decreasing.

## D. July 25 and 26 Before the Filly's Transport to the Clinic

Ron testified they followed Gilbert's instructions regarding the horse's treatment. Gilbert testified he did not give the Gabriels a choice as to whether the horse should receive the medication ordered. According to the Gabriels' note cards, however, there is no indication they gave the horse any medication on Sunday, July 25.

## E. Transport to Clinic on July 26

Lana called the clinic when the filly's condition worsened and her breathing became labored and rapid. Howton directed her to bring the horse to the clinic because it sounded as though the filly was in serious condition. He testified that he is able to run laboratory tests at his clinic more efficiently and that he relies on laboratory results to give thorough care in these instances. He further testified that, when the filly arrived at the clinic late that Monday, she was already "trying to die" and, although he administered several fluids and medications, he was unable to save her.

## F. Medical Cause of Death

Despite Howton's efforts, the filly died two to three hours after arriving at the clinic. According to Howton, the horse died from renal failure brought about by complications from endotoxemia resulting from Colitis X. Colitis X is the term used for the rapid onset of colitis, an inflammation of the large intestine.

Howton testified to the many causes of Colitis X. He said that, "[a]ccording to the so-called experts," the cause of colitis can only be determined approximately twenty percent of the time. Antibiotic and anti-inflammatory medication are two of the many causes of Colitis X. Both doctors testified that no act or omission of the Gabriels caused the death of the horse.

## G. Events Following the Death of the Filly

The morning following the filly's death, her body was picked up by a stock removal company, processed, and ground into greyhound food. Lovewell was not notified of this arrangement and did not consent to

disposal in such a manner.[2]

## H. Lovewell's Allegations

Lovewell brought suit against the Gabriels, alleging sixteen specific theories of negligence. He alleged the Gabriels were negligent by the following acts or omissions: 1) failing to have a trailer to transport the sick horse; 2) failing to provide proper supervision and care for the horse; 3) failing to provide care that was represented to be given but, in fact, was not; 4) providing medication to the horse without authorization; 5) administering improper medication to the horse; 6) failing to adequately hydrate the horse; 7) administering medication to the horse without knowledge of its side effects; 8) failing to have proper equipment to care for the horse; 9) failing to properly supervise employees that cared for the horse; 10) allowing the horse to become dehydrated; 11) allowing the horse to become dehydrated and administering medication that had not been prescribed by the Gabriels' veterinarians; 12) failing to take the horse to a place where proper care could have been given, even though requested to do so by the Gabriels' own veterinarian; 13) transporting the horse when it was not safe to do so; 14) failing to seek immediate treatment for the horse when it had diarrhea and pneumonia; 15) failing to properly wean the horse; 16) lacking the basic knowledge to allow them to properly care for the horse. Lovewell also alleged breach of an implied warranty to render services in a good and workmanlike manner.

2. Lovewell alleged a bailment relationship with the Gabriels. By doing so, he invoked a rebuttable presumption of negligence by proving the bailment and that the horse was not returned to him. *See Andrews v. Allen,* 724 S.W.2d 893, 895–96 (Tex.App.-Austin 1987, no writ).

## I. Lovewell's Testimony on Conversation with Howton

### 1. Previous Attempts To Get Hearsay Testimony into Evidence

■ On two occasions, Lovewell attempted to introduce testimony regarding statements Howton made to him. First, Lovewell tried to introduce this testimony through his friend, Lee Barton, who was present with Lovewell and Howton at the clinic during the conversation in question. Second, Lovewell tried to introduce his own testimony concerning the conversation between himself and Howton. Both times he argued that the statements were admissible as statements by an agent of a party opponent. *See* Tex.R. Evid. 801(e)(2)(D). Both times, the trial court disallowed the testimony.

### 2. The Gabriels Open the Door

The Gabriels then elicited the following testimony on direct examination of Howton:

Q. Do you remember, Dr. Howton, having any conversations with Mr. Lovewell after the filly died?

A. Yes, sir.

Q. What do you remember about those?

A. Very little.

Q. Okay. Do you remember telling Mr. Lovewell that the filly died because it wasn't brought in soon enough?

A. No.

Q. Do you remember telling Mr. Lovewell the filly died because of some-

The Gabriels admitted they owed a duty to Lovewell. They do not challenge the evidence regarding the breach of that duty or a breach of the warranty. Thus, the only issue on appeal is the sufficiency of the evidence to prove causation.

thing Ron and Lana Gabriel did or did not do?

A. No.

At this point, Lovewell argued the Gabriels opened the door to the previously-rejected testimony regarding the telephone conversation.

### 3. Rebuttal Testimony Allowed

Outside the presence of the jury, the trial court agreed the Gabriels' direct examination of their witness on his memory of conversations with Lovewell opened the door to Lovewell's testimony about what Howton said to him during that conversation. The Gabriels again urged their objection to the testimony as hearsay. The trial court overruled the objection. The jury was returned, and Lovewell was permitted to testify on rebuttal that Howton attributed the death of the horse to the Gabriels' failure to bring it to the clinic sooner:

Q. I want to take you back in time to when you went to the clinic and spoke with Dr. Howton. Do you understand what I'm asking you about?

A. Okay.

Q. Did you have a conversation with Dr. Howton—

A. I did.

Q. —at the clinic? Did you talk to him about his opinions and his expressions about your horse that day when you first went up there?

A. Yes, sir.

Q. Did he provide you his opinions and his thoughts about why your horse died?

A. Yes, sir.

. . . .

Q. What did he tell you?

. . . .

A. When he walked in, he shook hands with me and he said, "This is a bad, bad deal. This should never have happened."

Q. Did he say why?

A. . . . . He said, "We had a vet out there Saturday. We wanted to bring him to the clinic, gave the fluids, Ron Gabriel said he didn't have a trailer, so he didn't bring it."

Q. Did you ask him whether or not that would have made a difference, in his opinion?

A. Yes, sir.

Q. What did he say?

A. I said, "If he had brought it in there Saturday, would the horse have died," and he said "No."

Q. Did you ask him about Sunday?

A. I did.

Q. What did he say?

A. He said, "He would have brought it in Sunday, it would have had a lot better chance."

Q. Did you ask him about Monday?

A. Yes, sir.

Q. What did he say?

A. "If it had been brought in Monday morning, it would have had a lot better chance."

### 4. The Door Was Opened to Hearsay

■ "Opening the door" or inviting testimony that would otherwise pertain to an inadmissible subject matter does not mean that such testimony is necessarily invited into evidence in any form, including hearsay.[3] However, where such testimony pertains to the same subject matter and is directly contrary to earlier testimony, it is

---

**3.** In the criminal law, see *Kipp v. State,* 876 S.W.2d 330, 337 (Tex.Crim.App.1994), and *Daniels v. State,* 25 S.W.3d 893, 898 (Tex. App.-Houston [14th Dist.] 2000, no pet.).

admissible, including hearsay.[4] In the instant case, Lovewell's testimony pertained to the same subject matter as did Howton's testimony and was directly contrary to Howton's testimony.[5] This evidence was clearly admissible for the limited purpose of impeaching Howton's earlier testimony. The trial court properly admitted it over the Gabriels' hearsay objection.

## J. Jury's Findings

Although Lovewell alleged sixteen specific theories of negligence, the jury charge properly included only one broad question on negligence: "Did the negligence, if any, of those persons named below proximately cause the occurrence in question?" The charge went on to define "negligence" and "proximate cause." The jury answered yes as to both Ron and Lana. The jury also found that the Gabriels failed to comply with a warranty and that such breach was the producing cause of Lovewell's loss.

## II. SUBSTANTIVE LAW

### A. Proximate Cause, Producing Cause Compared

■ Negligence requires a showing of proximate cause, while producing cause is the test when alleging a breach of an implied warranty. TEX. BUS. & COM.CODE ANN. § 17.50(a)(2) (Vernon 2002); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex.2001); *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex.1998); *Cont'l Dredging, Inc. v. De–Kaizered, Inc.*, 120 S.W.3d 380, 391 (Tex.App.-Texarkana 2003, pet.

denied). Proximate cause and producing cause differ in that foreseeability is an element of proximate cause, but not of producing cause. *Read*, 990 S.W.2d at 737; *Parkway Co. v. Woodruff*, 857 S.W.2d 903, 914 (Tex.App.-Houston [1st Dist.] 1993), *modified on other grounds & aff'd*, 901 S.W.2d 434 (Tex.1995).

### B. Proximate Cause

■ Proximate cause consists of both cause in fact and foreseeability. *Read*, 990 S.W.2d at 737. Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred. *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 936 (Tex.App.-Texarkana 1997, writ denied). The cause-in-fact element of proximate cause is met when there is some evidence that the defendant's " 'act or omission was a substantial factor in bringing about injury' without which the harm would not have occurred." *Read*, 990 S.W.2d at 737.

■ Foreseeability, in the context of proximate cause, requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Id.* Foreseeability in the context of causation asks whether an injury might reasonably have been contemplated because of the defendant's conduct. *Id.* Foreseeability does not permit simply viewing the facts in retrospect and theorizing an extraordinary sequence of events by which the defendant's conduct caused the

---

4. See *Thrash v. State*, 500 S.W.2d 834 (Tex.Crim.App.1973).

5. Alternatively, it might be concluded that the Gabriels' introduction of the conversation into evidence allowed Lovewell to testify to the conversation to make it fully understood. *See* TEX.R. EVID. 107. TEX.R. EVID. 107 provides, in pertinent part, that:

When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence....

injury. *Id.* Rather, the question of foreseeability "involves a practical inquiry based on 'common experience applied to human conduct.'" *Id.*

■ Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996). When causation facts are disputed, causation may be established by circumstantial or direct evidence. *McMillen Feeds, Inc. v. Harlow,* 405 S.W.2d 123, 130 (Tex.Civ.App.-Austin 1966, writ ref'd n.r.e.). The plaintiff need not exclude every other possibility. *Comty. Pub. Serv. Co. v. Dugger,* 430 S.W.2d 713, 719 (Tex.Civ.App.-Texarkana 1968, no writ). All that is required is proof of a causal connection beyond the point of conjecture or mere possibility. *Lenger v. Physician's Gen. Hosp.,* 455 S.W.2d 703, 706 (Tex.1970).

## C. Producing Cause

■ A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Roberts v. Healey,* 991 S.W.2d 873, 878 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Common to both proximate and producing cause is causation in fact, including the requirement that the defendant's conduct be a substantial factor in bringing about the plaintiff's injuries. *Id.* However, producing cause requires a lesser burden than proximate cause because it does not require foreseeability.

## III. ANALYSIS

The Gabriels contend expert testimony was necessary to aid the jury on the element of causation in this case. They argue that, without such testimony, legally and factually insufficient evidence supports the causation element to support the judgment against the Gabriels for negligence or breach of implied warranty.

## A. Necessity of Expert Testimony

■ A jury may decide the required causal nexus between the event sued upon and the plaintiff's injuries when 1) general experience and common sense will enable a layperson to fairly determine the causal nexus; 2) expert testimony establishes a traceable chain of causation from injuries back to an event; or 3) expert testimony shows a probable cause nexus. *Weidner v. Sanchez,* 14 S.W.3d 353, 370 (Tex.App.-Houston [14th Dist.] 2000, no pet.). In this case, many of the circumstances surrounding the cause of the filly's death were matters within the jury's common understanding. The jury was further aided by the Gabriels' own experts' testimony in concluding there was a probable cause nexus between the Gabriels' acts or omissions and the filly's demise. As Lovewell asserts, this is not a veterinary malpractice case; the veterinarians were not the defendants. The acts and omissions of Ron and Lana must be the focus of our analysis.

## B. Scope and Force of Lovewell's Hearsay Testimony

### 1. No Limiting Instruction Requested

■ The Gabriels were entitled to a limiting instruction concerning Lovewell's hearsay testimony contradicting Howton's earlier testimony. The Rules of Evidence allow such an instruction to the jury when evidence is admitted for a limited purpose. Tex.R. Evid. 105. It is incumbent on the opponent of the evidence to request such an instruction. In the absence of a request by the opponent, the trial court's failure to instruct the jury cannot be a ground for complaint on appeal. Tex.R.

EVID. 105. Here, the Gabriels did not request the trial court give the jury a limiting instruction regarding the purpose of this impeaching testimony by Lovewell, and the trial court did not give one, either at the time the testimony was given or in the court's charge to the jury. We must now assess the impact of Lovewell's testimony in light of the absence of a limiting instruction.

**2. Without Instruction, Testimony Was Considered for Any and All Purposes**

■ This Court has held that evidence admitted without limitation comes into evidence for any and all purposes. *Cigna Ins. Co. v. Evans*, 847 S.W.2d 417, 421 (Tex.App.-Texarkana 1993, no writ). In *Evans*, a document was offered into evidence for a limited purpose. The document was admitted over Cigna's hearsay objections. The document was then read in its entirety to the jury, but no instruction was requested or given to restrict the jury's consideration of the document to a limited purpose. *Id.* On appeal, Cigna claimed the document was admitted only for a limited purpose, but this Court found that assertion was not supported by the record. *Id.* We noted that the document was read in its entirety to the jury; that the court did not state it was admitting the document for a limited purpose, nor did it so instruct the jury; and that counsel for Cigna did not request such an instruction or object to its absence. *Id.* at 421. This Court held that, "In the absence of any directive to the fact finder to consider a piece of evidence only for a limited purpose, the fact finder may consider it for any and all purposes." *Id.*

The Austin court relied on *Evans* to reach a similar conclusion when evidence was admitted without a limiting instruction. *See Owens–Corning Fiberglas Corp. v. Keeton*, 922 S.W.2d 658, 660 (Tex.App.-Austin 1996, writ denied).[6] Most recently, the Amarillo court relied on *Evans* to reach a similar conclusion. *First United Bank v. Panhandle Packing & Gasket, Inc.*, No. 07-04-0039-CV, —— S.W.3d ——, —— – ——, 2005 WL 607985, *16-16, 2005 Tex.App. LEXIS 1995, at *15-16 (Tex. App.-Amarillo Mar.16, 2005, no pet. h.).[7]

Criminal cases have arrived at similar conclusions with respect to evidence admitted without a limiting instruction. When confronted with impeaching evidence admitted without limitation, the Texas Court of Criminal Appeals plainly held that "once evidence is received without a proper limiting instruction, it becomes part of the general evidence in the case and may be used as proof to the full extent of its rational persuasive power." *See Garcia v. State*, 887 S.W.2d 862, 878 (Tex.Crim.App.1994) (citing 1 Edward W. Cleary et al., *McCormick on Evidence* 4th Ed. § 54 (1992)); *see also Hammock v. State*, 46 S.W.3d 889, 892 (Tex.Crim.App.2001). The Fourteenth court, likewise, held that, if impeaching evidence is admitted without a limiting instruction, it becomes part of the general evidence and may be considered for all purposes. *See Arana v. State*, 1 S.W.3d 824, 829 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd).

The rationale behind this rule is clear: We cannot burden the jury with the task of limiting its consideration of certain items of evidence when, although the evidence may have been intended to have a limited purpose, the limitation was never

**6.** *See also Wong v. Graham*, 2001 WL 123932, 2001 Tex.App. LEXIS 978, at *3-4 (Tex.App.-Austin Feb. 15, 2001, no pet.) (not designated for publication).

**7.** Lexis identifies this opinion as not designated for publication. The Amarillo court's case information does not confirm this.

communicated to the jury. "Jurors cannot be expected to know exactly how to use the evidence unless we tell them, nor can we guarantee that they will 'remain open-minded until the presentation of all of the evidence and instructions.'" *Hammock,* 46 S.W.3d at 893–94 (citing *Rankin v. State,* 974 S.W.2d 707 (Tex.Crim.App. 1996)).

### 3. Hearsay Testimony Can Support Judgment

■■■■■ We also rely on another rule of evidence to arrive at our holding that Lovewell's testimony was before the jury for any and all purposes. Even as inadmissible hearsay, once into evidence without limitation, then it may support a judgment. Hearsay statements are not "incompetent" evidence and, therefore, may support a judgment, whereas speculative and conclusory expert testimony will not. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 n. 1 (Tex.2004); *Olympic Arms, Inc. v. Green,* No. 01–02–00781–CV, 2004 WL 3017037, *6–7, —— S.W.3d ——, ——, 2004 Tex.App. LEXIS 11825, at *20 n. 7 (Tex.App.-Houston [1st Dist.] Dec. 30, 2004, no pet.).

### 4. Testimony Was Not Conclusory

■■■ *Coastal Transport's* also brings another issue into our consideration. While hearsay testimony is not incompetent and may support a judgment, speculative and conclusory expert testimony will not. A statement of an expert witness that had no facts to support the expert's conclusions is insufficient to create a question of fact because it is not credible or susceptible to being readily controverted. *McIntyre v. Ramirez,* 109 S.W.3d 741, 749

(Tex.2003); *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996). *Coastal Transport* stands for the proposition that such evidence is incompetent and cannot support a judgment. The Gabriels rely on *Coastal Transport's* holding to argue that Howton's statements embedded within Lovewell's testimony are conclusory and, thus, incompetent. They also contend such statements do not constitute expert testimony as defined by Rule of Evidence 702.[8]

Even if Howton's statements to Lovewell do not qualify as expert testimony under Rule 702, such statements included a factual basis and had probative value. The record shows that Gilbert, Howton's partner at the clinic, had been called to the Gabriels' farm on Saturday, July 24, to treat the ailing horse. The record further shows that, on that day, Lana had taken the farm's trailer out of town to a horse show and their trailer was therefore not available to transport the horse to the clinic. Howton testified that he had been a practicing veterinarian for several years and that he provided a great deal of veterinary care for the Gabriels' quarter horse farm. More specifically, Howton testified he treated the filly on the day it died. He also testified the horse was severely dehydrated on its arrival at the clinic. There is ample factual basis in the record for Howton's statements to Lovewell.

### C. Sufficiency of the Evidence

We hold that Lovewell's testimony was before the jury for any and all purposes and now turn to a review of the entire record with this in mind.

### 1. Standards and Scope of Review

8. Tex R. Evid. 702 provides:
    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

■ When both legal and factual sufficiency issues are raised, the court should review the legal sufficiency first to determine whether there is any probative evidence to support the jury's verdict. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981).

### a. Legal Sufficiency Review

■ We consider all the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference of the prevailing party. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998). A point challenging the legal sufficiency of the evidence will be sustained only when 1) there is a complete absence of evidence of a vital fact, 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, 3) the evidence offered to prove a vital fact is no more than a scintilla, or 4) the evidence conclusively establishes the opposite of a vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

### b. Factual Sufficiency Review

■ In a factual sufficiency review, we must consider all the evidence in the case in a neutral light to determine whether the jury's verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Lofton v. Tex. Brine Corp.*, 720 S.W.2d 804, 805 (Tex. 1986).

### 2. Legally Sufficient Evidence

■ Because Lovewell's hearsay testimony carries full probative force, the jury could rely on that testimony for causation. To support this conclusion, there is also testimony, as noted above, that Lana was out of town at the time and that she had with her the farm's horse trailer. Therefore, we cannot conclude there is a complete absence of a vital fact. Additionally, as we have discussed in detail, the Rules of Evidence do not prevent us from giving weight to Lovewell's testimony concerning what Howton told him. Failure to have a trailer to transport the sick horse and failure to take the horse to a place where proper care could be given were specific acts of negligence alleged by Lovewell against the Gabriels, and this evidence specifically supports those allegations.

■ Likewise, we cannot conclude that this record conclusively establishes the opposite of a vital fact. The opinion testimony of expert witnesses, even though not contradicted by an opposing expert, is generally held not to be binding on the trier of fact if more than one possible conclusion can be drawn from the facts. *Gregory v. Texas Employers Ins. Ass'n*, 530 S.W.2d 105, 107 (Tex.1975); *Exxon Corp. v. West*, 543 S.W.2d 667, 672 (Tex. Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.).[9] Even when the subject matter of the expert's testimony is such that the trier of fact must be guided solely by the opinion of experts, the opinions given by the expert witnesses may be regarded as conclusive only if they are otherwise credible and free from contradiction and inconsistency. Lovewell's testimony, at a minimum, diminished Howton's credibility and certainly contradicted both Gilbert's and Howton's testimony regarding the cause of the horse's death. That being said, the jury was free to draw its own conclusion based on the expert testimony before it of the Gabriels' treatment and care of Lovewell's horse.

**9.** This is particularly true where the expert's testimony is based on studies made while in the employ of the party who is offering his or her testimony. *Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167, 189 (1958).

The testimony concerning the medications and the manner in which they were administered is additional evidence the jury was entitled to consider. This evidence included the testimony of the Gabriels' own experts that some of these medications have the propensity to cause the very symptoms from which this filly died. Howton testified Erythromycin is "very prone to cause diarrhea." Ron testified he administered this antibiotic to the filly and, although he further testified he never administered antibiotics without a veterinarian's prescription, both doctors, Gilbert and Howton, denied ordering this medication. The Gabriels also gave this horse Banamine. Gilbert denied ordering Banamine, and Howton said it is "possible" he ordered it. Howton testified that Banamine can cause colitis and that veterinarian consultation before its use is vital, especially when a horse is dehydrated. He said this special concern is due to the fact Banamine is excreted through the kidneys and can, therefore, lead to renal problems. Uremia is one of those complications and is one which this filly suffered.

Further, the Gabriels' records showed that no medications were administered to this filly on Sunday, July 24, the day before the horse died. The jurors could reasonably infer from this evidence that the Gabriels failed in part to follow Gilbert's instructions in their treatment of the horse.

Finally, the evidence showed that, even though Howton knew the filly was not owned by the Gabriels, its body and a blood specimen taken from the horse were promptly destroyed without Lovewell's knowledge or consent. This was done without a necropsy having been performed and without an independent analysis of the blood specimen. The jurors were entitled to consider this evidence, along with the long-standing business relationship Howton had with the Gabriels, in drawing inferences that reasonably support the verdict.

The jurors were entitled to consider all this evidence in light of their own general experience and common sense and conclude that the Gabriels' acts or omissions were a substantial factor in bringing about the injury (the death of the horse), without which acts or omissions the harm would not have occurred. *See Read,* 990 S.W.2d at 737. Viewing the evidence in a light most favorable to the verdict, we conclude it was legally sufficient to support the jury's verdict.

### 3. Factually Sufficient Evidence

The record reveals that the jury relied on Lovewell's testimony about his conversation with Howton to some extent, as indicated by notes to the trial court during deliberations. Additionally, we again note the record shows that Lana had taken the farm's trailer out of town to a horse show for a few days and that the trailer was not there on Saturday, July 24. Ron testified as to the availability of trailers at his property, indicating that, even if the farm's trailer was being used, he had access to several owners' trailers left on his property or he could have borrowed one from a neighbor. The jury, however, could have disregarded this testimony. A jury is free to believe or disbelieve the testimony of any witness, or any part of a witness' testimony.

Both veterinarians testified to the possible side effects of the drugs administered by the Gabriels. In other words, their testimony established that the drugs have the propensity to cause some of the ailments suffered by the horse. But they both also testified that the drugs did not in this case. The veterinarians both testified the Gabriels did not cause the death of the horse. However, as we previously concluded, the Gabriels' experts' testimony on

the cause of the filly's death was not conclusive on the matter. In light of *Gregory* and *West,* the jury was free to disregard the veterinarians' trial conclusions. Considering all of the evidence in a neutral light, we cannot conclude the jury's verdict was so against the great weight and preponderance of the evidence as to be manifestly unjust.

## IV. CONCLUSION

In summary, the impact of the admission of Lovewell's testimony concerning his conversation with Howton is at least two-fold. First, without having been limited before the jury, the testimony carries full probative weight. This testimony, together with the other evidence and its logical inferences, renders the evidence legally and factually sufficient to support the jury's verdict in favor of Lovewell. Second, Lovewell's hearsay testimony undermines the experts' testimony that the Gabriels' acts or omissions were not the cause of the horse's death and, thus, eliminates the conclusive nature that the experts' testimony likely would have had otherwise. For these reasons, we conclude the evidence is legally and factually sufficient to support the jury's verdict.

We affirm the judgment.

JACK CARTER, Justice, dissents.

The central issue in this case is whether alleged acts of negligence by the Gabriels caused the death of Lovewell's filly. Though Lovewell presented no expert testimony, the majority nevertheless concludes the evidence is legally and factually sufficient to support the jury's finding of negligence and proximate cause. The majority reaches this conclusion after holding Lovewell was not required to present expert testimony on the issue of causation. Because I disagree with that assessment of the law, I respectfully dissent.

Lovewell's suit against the Gabriels alleged sixteen theories of negligence. A cause of action for ordinary negligence requires a showing (1) that the defendant owed the plaintiff a duty recognized by law, (2) that there was a breach of that duty, (3) that the breach of the defendant's duty proximately caused injury to the plaintiff, and (4) that the plaintiff suffered actual loss or damages as a result of the defendant's negligent conduct. *Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 273–74 (Tex.2002); *Sunbridge Healthcare Corp. v. Penny,* 160 S.W.3d 230, 243, 2005 Tex.App. LEXIS 1887, at *26 (Tex. App.-Texarkana Mar.11, 2005, no pet.). "An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. Prosser, Law of Torts (3rd Ed.) 240–241, 'Causation', 41 (1964)." *E. Tex. Theatres, Inc. v. Rutledge,* 453 S.W.2d 466, 468 (Tex. 1970).

Lovewell alleged that the Gabriels committed acts or omissions that proximately caused the death of the horse. Therefore, proof of the cause of the death of the horse was required. The majority opinion states that the circumstances surrounding the cause of the filly's death were matters within the jury's common understanding. In this case, the evidence shows that the horse died from renal failure due to complications from endotoxemia resulting from Colitis X. May a jury make the determination, without expert testimony, that the actions or omissions of the Gabriels were the cause in fact of the horse contracting Colitis X causing endotoxemia and renal failure and ultimately death? The veterinarians testified that no act or omissions of the Gabriels caused the death of the horse. It is undisputed that there are many

causes of Colitis X. The Texas Supreme Court has stated:

> In determining the question of proximate cause, the general rule is "that proof of causation must be beyond a showing of a possibility that the injuries arose from the defendant's negligence or lack of skill, since the jury will not be permitted to speculate as to the cause of the injury. Thus where the evidence most favorably to the plaintiff develops more than one equally probable cause, for one or more of which defendant is not responsible, the plaintiff has failed to sustain his burden of proof."

*Hart v. Van Zandt,* 399 S.W.2d 791, 792–93 (Tex.1965) (quoting 13 A.L.R.2d 22) (superseded by statute on other grounds, *see Peterson v. Shields,* 652 S.W.2d 929, 930 (Tex.1983)).

Though not precisely on point, a recent decision by the Second Court of Appeals supports the Gabriels' position that Lovewell was required to present expert testimony at trial regarding causation. In *McGee v. Smith,* a horse owner sued a veterinarian for negligent care that allegedly led to the death of a foal. 107 S.W.3d 725, 726–27 (Tex.App.-Fort Worth 2003, pet. denied). The horse owner offered no expert testimony at trial on the element of causation. *Id.* at 727. Instead, the owner "relied on his own testimony and that of his father-in-law. Although both men had been involved in the horse industry for many years, neither was qualified as an expert in veterinary medicine." *Id.* The court of appeals wrote that veterinary malpractice cases, like medical malpractice cases, require the plaintiff to provide expert testimony to prove causation "unless the form or mode of treatment is a matter of common knowledge, or the matter is within the experience of a layperson." *Id.* The *McGee* court ultimately held the dearth of expert evidence on behalf of the plaintiff's case was insufficient to support the jury's verdict. *Id.* at 728. The court then reversed the trial court's judgment and rendered a take—nothing judgment for the veterinarian. *Id.*

Given the facts of this case—the array of drugs (Rebound, Naxcell, Erythromycin, Banamine, Ampicillin, and Gentamicin) that had been recently administered to the horse, the side effects of those drugs to create or exacerbate other life-threatening illnesses, the short onset of death (less than one week passed from the onset of symptoms until the filly's death), the complex nature of the disease, and the treatment by multiple veterinarians and other care providers—I believe that understanding the proximate cause of the filly's death would be outside the purview of a layperson's common knowledge or experience. Jurors do not commonly have experience in diagnosing the cause of a disease or ailment, especially in equines. Without expert testimony, the jury must engage in speculation to conclude that the actions of the Gabriels proximately caused the death of the horse. Even if there is evidence of the Gabriels' negligence, there must be a connection between the negligence and the death of the animal. In cases involving the diagnosis and progression of a disease leading to death, that connecting link is supplied by expert testimony. *See Ins. Co. of N. Am. v. Myers,* 411 S.W.2d 710, 713 (Tex.1966); *Tex. Employers Ins. Ass'n v. Gallegos,* 415 S.W.2d 708, 711 (Tex.Civ. App.-San Antonio 1967, no writ). I believe the causal nexus between the alleged acts of negligence and the death of the filly should have been established and supported by expert testimony presented during Lovewell's case-in-chief.

Though this is not a malpractice case, the facts and issues are more than sufficiently akin to the complex area of veterinary science that I believe similar expert

testimony was essential to aid the jury. I do not believe there is any probative evidence to support the jury's finding on causation and, therefore, the case should be reversed and rendered.